**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3127
_____

YUSEF STEELE,
Appellant

v.

WARDEN CICCHI;
DEPUTY WARDEN F. MASONE;
INTERNAL AFFAIRS SGT DEAMICIS;
CAPTAIN C. BARTH
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.N.J. No. 3-09-cv-03551)
District Judge:  Honorable Mary L. Cooper
_____

Argued: June 16, 2016

Before:  AMBRO, RESTREPO, and NYGAARD,
*Circuit Judges*

(Filed: May 3, 2017)
_____

MICHAEL S. DOLUISIO
CATHERINE V. WIGGLESWORTH
Dechert
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA  19104

WILLIAM STEWART*      [ARGUED]
University of Pennsylvania
School of Law
3400 Chestnut Street
Philadelphia, PA  19104
        *Counsel for Appellant*

LORI A. DVORAK          [ARGUED]
Dvorak & Associates
390 George Street
8th Floor
New Brunswick, NJ  08901
        *Counsel for Appellee Edmond Cicchi*

CLARK W. CONVERY
Convery Convery & Shihar
32 South Main Street
Edison, NJ  08837

---

* Mr. Stewart, a law student, was permitted to enter his appearance and participate in oral argument pursuant to Third Circuit L.A.R. 46.3.  We note that Mr. Stewart and his supervising attorneys represented Appellant *pro bono*. We thank them for taking this case on a *pro bono* basis and for their excellent advocacy on Appellant's behalf.

2

*Counsel for Appellee Deputy Warden F. Masone*

PATRICK J. BRADSHAW
Kelso & Bradshaw
132 Hamilton Street
P.O. Box 1208
New Brunswick, NJ 08903
        *Counsel for Appellee Internal Affairs Sgt. De Amicis*

SUSAN K. O'CONNOR
Hoagland Longo Moran Dunst & Doukas
40 Paterson Street
P.O. Box 480, Room 301
New Brunswick, NJ 08903
        *Counsel for Appellee Captain C. Barth*

_____

OPINION OF THE COURT

_____

RESTREPO, *Circuit Judge.*

Plaintiff/Appellant Yusef Steele was a pretrial detainee housed at the Middlesex County Adult Correction Center ("MCACC") in New Jersey in late 2008 and early 2009. During the course of his detention at MCACC, officials at the facility received credible information that Steele was involved in a scheme with an outside bail bonds service, Speedy Bail Bonds. Officials believed that Steele was threatening other detainees in order to coerce them into using Speedy and that

Steele was receiving some form of compensation from Speedy for his efforts. After interviewing Steele and advising him of the allegations against him, officials placed him in administrative segregation while they continued to investigate his conduct. During his time in segregation, Steele's telephone privileges were restricted to legal calls only.

Steele claims in this Section 1983 suit that the Defendant/Appellee MCACC officials violated his due process rights when they transferred him to administrative segregation in the facility and restricted his phone privileges, which interfered with his ability to attempt to find a co-signer for his own bail. The District Court granted summary judgment for all Defendants. For the reasons that follow, we will affirm.

## I. FACTUAL BACKGROUND[1]

On December 22, 2008, Steele was arrested for violating a narcotics restraining order. He was then placed into pretrial detention at MCACC. The next day, Steele's bail was set at $50,000, which he was unable to pay.

On February 23, 2009, while Steele remained in detention at MCACC, Robert Gluck, a private attorney, contacted MCACC Deputy Warden Masone about safety concerns Gluck had for his client, another MCACC detainee. According to Gluck, Steele approached Gluck's client and threatened to disclose his client's sex offense charges to MCACC's general population if Gluck's client did not use a

---

[1] The parties have not disputed the facts outlined herein, unless otherwise noted.

specific bail bonds service, Speedy Bail Bonds. Gluck reported that Steele handed his client a document that listed his client's charges and bail amount. Gluck also faxed to Masone a copy of the document.

After obtaining this information from Gluck, Masone and Sergeant Paul De Amicis began an investigation of Steele and Speedy's activities within MCACC. They interviewed Gluck's client, who confirmed that Steele threatened him and provided him with a specific phone number to use to arrange his bail. Masone and De Amicis confirmed that the phone number belonged to a Speedy office.

De Amicis continued the investigation by reviewing recorded phone calls from the unit in which Steele was housed. He found numerous calls between Steele and Speedy, during which Steele referenced detainees' names, identification numbers, and the specific amounts of their bails. According to De Amicis, Steele bragged in some of those phone conversations about "his ability to get other inmates to post bail using Speedy" and Steele "referred to credit he expected to receive for bails he recruited for Speedy." App. 1312. Based on the results of the preliminary investigation, MCACC officials believed that Steele "was acting as an illegal agent for Speedy" and that he was receiving some type of compensation from Speedy in exchange for his efforts to arrange detainees' bails. App. 1312.

MCACC officials met with Steele on February 25, 2009, just two days after Gluck's call, to discuss the

5

allegations.[2] During the meeting, MCACC officials apprised Steele of a complaint they received that he had been "making money for the bail bondsmen," "threatening inmates," and "trying to get money out of [them]." App. 1303. Officials asked Steele to explain his actions with Speedy and permitted him to respond to their questions. Steele admitted to helping other detainees arrange bails, but denied that he was receiving any compensation from Speedy. Steele stated that he was arranging detainees' bails with Speedy "out of the goodness of [his] heart." App. 1305. As officials were meeting with Steele on February 25th, MCACC corrections officers searched Steele's cell and found materials that corroborated the allegations against him. These materials included lists of detainees' names, bail amounts, and phone numbers of detainees' friends and relatives.

That same day, Steele was transferred to administrative segregation.[3] De Amicis averred that Steele was placed in administrative segregation in order "to prevent

---

[2] Sergeant De Amicis stated that the officials who attended the meeting were Warden Cicchi, Deputy Warden Masone, and De Amicis. According to Steele's complaint, Masone, Defendant Captain Barth, and probably De Amicis attended the meeting. During his deposition, Steele stated that Barth and Masone were the MCACC officials who attended the February 25th meeting.

[3] On February 26, 2009, MCACC provided Steele with a letter confirming his transfer to administrative segregation, which noted that the Classification Committee would review Steele's status on a monthly basis.

him from posing additional security risks in the [MCACC] and to allow further investigation into Speedy's activities without [Steele's] interference." App. 1313. Later in the day on February 25th, Masone and De Amicis met with employees of Speedy, who confirmed that Steele was an "associate" who was recruiting other detainees to use Speedy for their bail bonds. App. 1313. After further investigation, MCACC officials contacted the county prosecutor's office and the New Jersey Department of Banking and Insurance.

The MCACC "Inmate Guidelines" manual ("the Manual"), which served as a guide for inmate conduct and jail procedures, contained a number of provisions addressing telephone access at the facility. It provided that individuals housed in the general population had open access to collect call telephones for personal calls and were allowed an unlimited number of legal calls. It also provided that individuals placed in "disciplinary lockup" were not permitted telephone access, with the exception of legal telephone calls. App. 1345. The Manual did not address telephone access for detainees housed in administrative segregation.[4] While he remained in administrative segregation, Steele was permitted only to make legal calls, through the MCACC social work office.

---

[4] The New Jersey Department of Corrections' 1999 "Handbook for Discipline for Inmates" was appended to the Manual. The Handbook addressed telephone access for inmates placed in Administrative Segregation. However, the Handbook stated that it applied only to state-sentenced inmates. Steele has not argued on appeal that the Handbook applied to him; his arguments center on the MCACC's own internal Manual.

7

On March 5, 2009, Steele's bail was reduced from $50,000 to $2,500. Thereafter, Steele made three attempts to contact his attorney to help him obtain a co-signer for his bail. Steele reached the attorney's secretary twice, and made contact with his lawyer on his third attempt. On March 20, 2009, Steele's bail was posted and he was released.

## II. PROCEDURAL HISTORY

Steele originally filed this action *pro se* in July 2009 in the United States District Court for the District of New Jersey. The operative Amended Complaint was filed *pro se* in May 2012. In his Amended Complaint, Steele asserted several claims under 42 U.S.C. § 1983: violations of his First, Eighth, and Fourteenth Amendment rights.

In December 2013, after five rounds of summary judgment motions, the District Court granted summary judgment to Defendants as to Steele's First and Eighth Amendment claims. The Court denied summary judgment as to Steele's claims under the Due Process Clause of the Fourteenth Amendment, but permitted Defendants to move for summary judgment again on those claims in January 2014. In May 2014, the District Court granted summary judgment to all Defendants on Steele's Fourteenth Amendment claims, holding that they did not violate Steele's rights under the substantive and procedural components of the Due Process Clause. Steele filed this timely appeal.[5]

---

[5] This Court granted Steele appointment of counsel for his appeal. He does not challenge the District Court's disposition of his First and Eighth Amendment claims.

## III. JURISDICTION & STANDARD OF REVIEW

The District Court had jurisdiction over this Section 1983 action pursuant to 28 U.S.C. § 1331. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

Summary judgment is appropriate where the moving party carries its burden to establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We review an award of summary judgment de novo, applying the same test on review that the District Court should have applied." *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 209 (3d Cir. 2005). That is, we review "the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Burns v. PA Dep't of Corr.*, 642 F.3d 163, 170 (3d Cir. 2011) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

## IV. DISCUSSION

The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, and contains both substantive and procedural components, *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998). Steele claims that Defendants violated both components, which we address in turn below.

### A. Substantive Due Process

"The substantive component of the Due Process Clause limits what government may do regardless of the

9

fairness of procedures that it employs," *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 399 (3d Cir. 2000), in order to "guarantee protect[ion] against government power arbitrarily and oppressively exercised," *Lewis*, 523 U.S. at 846 (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). To maintain a substantive due process claim, Steele must have been deprived of a particular interest that "is protected by the substantive due process clause." *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008).

Steele claims that Defendants' actions infringed on four separate liberty interests. First, he asserts that Defendants interfered with his "constitutionally-protected liberty interest" in "posting bail once his bail was set."[6] Br. of Appellant 16 (capitalization omitted). Second, Steele argues that by placing him in administrative segregation, Defendants interfered with his constitutional liberty interest in avoiding punishment prior to an adjudication of guilt. Third, Steele contends that Defendants interfered with his "state-created liberty interest[]" in accessing the telephones at MCACC, an interest that Steele argues was created by the MCACC Manual. Br. of Appellant 24. Fourth, Steele argues that his administrative segregation violated his "state-created liberty interest in remaining part of the general prison population." Suppl. Br. of Appellant 1-2.

As an initial matter, Steele cannot proceed on his third and fourth claimed liberty interests, because substantive due

---

[6] To be clear, Steele claims a liberty interest in exercising his bail option using funds already available to him. His claim does not touch on issues relating to the amount of his bail or his ability to pay.

process claims do not arise out of state-created liberty interests. In contrast to procedural due process rights, which may be derived from state law, "[s]ubstantive due process rights are founded not upon state law but upon deeply rooted notions of fundamental personal interests derived from the Constitution." *Nunez v. Pachman*, 578 F.3d 228, 233 (3d Cir. 2009) (quoting *Nilson v. Layton City*, 45 F.3d 369, 372 (10th Cir. 1999)); *see also Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring) (explaining that procedural due process protects certain interests even though those interests are "derived from state law rather than the Constitution," but "substantive due process rights are created only by the Constitution"). Therefore, as we examine Steele's substantive due process claims here, we consider only Steele's two claimed constitutionally protected liberty interests, which are themselves interrelated. These are: (1) exercising his bail option once his bail was set, and (2) remaining free from punishment before an adjudication of guilt.[7]

### 1. *Exercising bail option*

There is no dispute between the parties that Steele had a constitutionally protected liberty interest in exercising his

---

[7] The District Court addressed Steele's allegations regarding bail access only insofar as they related to the question of whether his transfer to administrative segregation amounted to unconstitutional punishment. Because we understand Steele to advance these as two factually intertwined but legally independent substantive due process claims, we will address each separately.

bail option, once bail had been set, sufficient to trigger substantive due process protection. We agree. Such a right emanates from the liberties "at the heart" of the Due Process Clause: the freedom "from government custody, detention, or other forms of physical restraint" prior to any determination of guilt. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *see also Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."). The Supreme Court has explained that an arrestee's right to freedom from pretrial detention is subordinated to other interests only in specific circumstances – particularly where there has been an adjudication that detention is necessary because an "arrestee presents an identified and articulable threat to an individual or the community," *United States v. Salerno*, 481 U.S. 739, 750-51 (1987), or to "ensure [an arrestee's] presence at trial," *Bell v. Wolfish*, 441 U.S. 520, 523 (1979). But those circumstances do not exist in a case like this one, where there has already been a judicial determination that an arrestee is eligible for release on bail and bail has been set for that arrestee.

Other Circuits acknowledge that substantive due process protection of this liberty interest attaches once arrestees are deemed eligible for release on bail. For instance, in *Dodds v. Richardson*, the Tenth Circuit explained that "an arrestee obtains a liberty interest in being freed of detention once his bail is set because the setting of bail accepts the security of the bond for the arrestee's appearance at trial." 614 F.3d 1185, 1192 (10th Cir. 2010). Likewise, the Eleventh Circuit held in *Campbell v. Johnson* that "[t]he Fourteenth Amendment Due Process Clause includes the right to be free from continued detention after it was or should

12

have been known that the detainee was entitled to release." 586 F.3d 835, 840 (11th Cir. 2009) (internal quotation marks omitted). Accordingly, we conclude that Steele had a protected liberty interest in exercising his bail option once his bail was set.

Having established that his asserted liberty interest is protected by substantive due process, Steele must also show that "the government's deprivation of that protected interest shocks the conscience." *Chainey*, 523 F.3d at 219. The Supreme Court has instructed that we must apply the "shocks the conscience" standard where, as here, the challenged government action is executive in nature rather than legislative.[8] *See Lewis*, 523 U.S. at 845-47. "[T]he exact degree of wrongfulness necessary to reach the 'conscience-shocking' level" will "depend[] upon the circumstances of a particular case," and may range from "deliberate indifference" to "actual intent to cause harm." *Vargas v. City of Phila.*, 783 F.3d 962, 973 (3d Cir. 2015) (internal quotation marks omitted). We cannot say that Defendants' actions here amount to even deliberate indifference.

MCACC officials permitted Steele, during his time in administrative segregation, to make calls to his attorney to arrange for bail. Indeed, Steele made three such phone calls to his attorney's office, through the MCACC social work

---

[8] Where the government infringes on a plaintiff's right through legislative activity, by contrast, the Supreme Court has explained that we must determine whether the legislation at issue is "narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

13

office, beginning the day after Steele's bail was reduced from $50,000 to $2,500. Steele offered no evidence that MCACC staff prevented or inhibited him from attempting to contact his attorney via phone. Steele also offered nothing to suggest that his attorney was ill-equipped to assist Steele with arranging bail. In addition, Steele's access to mail was not restricted during his time in segregation. In short, though MCACC officials curtailed Steele's unlimited, non-legal phone privileges during his administrative segregation, officials preserved two key channels of communication through which Steele could attempt to secure his bail while in segregation.

Steele's circumstances are distinguishable from the arrestees' circumstances in *Dodds* and *Campbell*. In *Dodds*, after a judge set the plaintiff-arrestee's bond, two individuals asked employees at the jail where the plaintiff was housed about posting bond on the plaintiff's behalf. *Dodds*, 614 F.3d at 1189-90. Those individuals were told in response by jail employees that bond would not be accepted before the plaintiff was arraigned by a judge, consistent with local policies. *Id.* The Tenth Circuit concluded that evidence showing the defendants' policies "*prevented* felony arrestees whose bail had been set from posting bail after hours and before arraignment" was sufficient to overcome summary judgment on plaintiff's due process claim. *Id.* at 1206 (emphasis added).

In *Campbell*, jail administrators refused to accept court-approved real estate documents as security for the plaintiff-arrestee's bail for months after his bail was set. *Campbell*, 586 F.3d at 838-39. The Eleventh Circuit found this evidence sufficient to overcome summary judgment on

the plaintiff's due process claim. *Id.* at 840-42; *see also Gaylor v. Does*, 105 F.3d 572 (10th Cir. 1997) (reversing grant of summary judgment for defendants on plaintiff-arrestee's due process claim, where bail was set but was never communicated to the plaintiff or other individuals inquiring about it). Officials' actions in *Dodds* and *Campbell* unreasonably inhibited, and essentially prevented, the plaintiffs from exercising their bail options after bail was set. On the record before us, we cannot say that MCACC officials put Steele in the same predicament.

At bottom, we cannot agree with Steele's argument that in the specific circumstances of this case substantive due process required Defendants to provide Steele with unlimited, non-legal telephone privileges during his time in administrative segregation so that he could attempt to find a co-signer for his bail and exercise his bail option.[9]

---

[9] Precedent addressing various constitutional protections of telephone access in detention settings informs and is consistent with our decision here. *See, e.g.*, *Valdez v. Rosenbaum,* 302 F.3d 1039, 1042-43, 1047 (9th Cir. 2002) (restricting telephone access of detainee placed in administrative segregation to one legal telephone call per day did not violate plaintiff's substantive due process rights); *Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir. 1994) (explaining that inmates do not have a constitutional right to unlimited telephone use); *Benzel v. Grammer*, 869 F.2d 1105, 1108 (8th Cir. 1989) (noting that inmates do not have a right to unlimited telephone use, and telephone communication with relatives and friends may be restricted "in a reasonable manner"); *Martin v. Tyson*, 845 F.2d 1451, 1458 (7th Cir. 1988) (holding that it did not violate the Due Process Clause

Defendants' limitation of Steele's phone privileges did not "shock the conscience," and therefore, Steele's claim that Defendants violated his due process right to exercise his bail option fails.[10]

_____

to limit pretrial detainees' non-legal calls); *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir. 1986) (stating that detainees' and inmates' constitutional right to telephone access is "subject to rational limitations in the face of legitimate security interests of the penal institution" (internal quotation marks omitted)).

[10] In their briefing, the parties apply the *Bell v. Wolfish* "punishment" framework, discussed in greater detail in Section IV(A)(2), *infra*, to Steele's bail claim. The District Court also applied the *Bell* framework to Steele's claims in its summary judgment opinion. But we do not find *Bell* to be squarely applicable to Steele's claim.

The Supreme Court in *Bell* explained that it was not addressing "the curtailment of liberty" resulting from the "decision to detain an accused." 441 U.S. at 533-34, 541. Rather, the Court was addressing specific conditions of pretrial confinement, such as double-bunking of detainees, which were "aspect[s] of pretrial detention" that did not violate other constitutional guarantees. *Id.* In this Circuit, we have applied *Bell* to address a range of conditions of pretrial detention, such as strip searches, *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 621 F.3d 296 (3d Cir. 2010); triple-celling, *Hubbard v. Taylor*, 538 F.3d 229 (3d Cir. 2008); and placement in isolation, *Stevenson v. Carroll,* 495 F.3d 62 (3d Cir. 2007). Other Circuits similarly have applied *Bell* to address conditions such as strip searches, *Byrd*

## 2. *Freedom from punishment*

Steele also claims that his placement in administrative segregation violated his substantive due process right to be free from punishment. Under the analytical framework established in *Bell*, detention officials' restrictions on pretrial detainees will constitute punishment prohibited by the Due Process Clause when: (1) "there is a showing of express intent to punish on the part of [those] [] officials"; (2) "the restriction or condition is not rationally related to a legitimate non-punitive government purpose," i.e., "if it is arbitrary or purposeless"; or (3) "the restriction is excessive in light of that purpose." *Stevenson*, 495 F.3d at 67-68 (quoting *Rapier*, 172 F.3d at 1005). Of these three possible means to establish punishment, Steele asserts only the second and third; he has not argued in his briefing that such an intent to punish was express in nature.

---

*v. Maricopa Cty. Sheriff's Dept.*, 629 F.3d 1135 (9th Cir. 2011); and solitary confinement, *Rapier v. Harris*, 172 F.3d 999 (7th Cir. 1999).

Steele's bail claim, however, challenges more than conditions of his pretrial detention. He challenges the curtailment of a separate and independent liberty interest that arose from his pretrial detention: his right to be freed from that detention, by exercising his bail option, once his bail was set. This claim fits awkwardly into the *Bell* framework, and more comfortably into the general "shocks the conscience" substantive due process framework applicable to executive actions. Nevertheless, for many of the same reasons provided in Section IV(A)(2), *infra*, Steele's bail claim would fare no better under *Bell*.

17

The term "punishment" in this context warrants further explanation. "Punishment," as used in *Bell*, refers to the punishment of a pretrial detainee for his alleged criminal conduct, committed *prior* to his detention, for which he has not yet been convicted. *Bell*, 441 U.S. at 535-36. The Supreme Court explained that this type of "punishment" is prohibited by the Due Process Clause because the detainee "ha[d] not been adjudged guilty of any crime" and "had only a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.'" *Id.* at 536-37 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)). *Bell* did not concern the type of "punishment" or discipline alleged in this case: punishment of a detainee for his in-facility conduct that might violate the facility's rules and policies. Despite the apparent distinctions between *Bell* and cases where a detainee claims that he was "punished" for his in-facility conduct, we agree with the First Circuit's determination in *Collazo-Leon v. U.S. Bureau of Prisons* that the "theoretical constitutional premises of *Bell*'s analysis provides some rational guidance" for evaluating claims involving in-facility conduct that could warrant disciplinary action.[11] 51 F.3d 315, 317-18 (1st Cir. 1995).

---

[11] The First Circuit explained in *Collazo-Leon*,

> [o]n the authority of *Bell*, it may be divined that even if a restriction or condition may be viewed as having a punitive effect on the pretrial detainee, it is

With that understanding, we turn to the question of whether Defendants had a "legitimate governmental objective" in transferring Steele to administrative segregation in this case. Steele argues that his segregation did not serve any rational purpose other than punishment. Viewing the evidence in the light most favorable to Steele, as we must, we cannot agree that Steele has presented evidence sufficient to create a genuine dispute of material fact on this issue. The record shows that Steele was placed into administrative segregation for internal security reasons.

The Supreme Court repeatedly has emphasized that maintaining internal security and order in jails and prisons are "legitimate governmental objectives" and that courts must give prison officials considerable discretion to manage

> nonetheless constitutional if it also furthers
> some legitimate governmental objective such as addressing a specific institutional violation and is not excessive in light of the seriousness of the violation. . . . If there is a reasonable relation between the sanctions and legitimate institutional policies, an intent to punish the detainee for prior unproven criminal conduct cannot be inferred.

51 F.3d at 318.

internal security in their institutions.  *See, e.g.*, *Sandin v. Conner*, 515 U.S. 472, 482-83 (1995) ("[F]ederal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment."); *Hewitt v. Helms*, 459 U.S. 460, 472 (1983) ("Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (quoting *Bell*, 441 U.S. at 547)), *receded from on other grounds by Sandin*, 515 U.S. at 482-83; *Bell*, 441 U.S. at 561 ("Ensuring security and order at the institution is a permissible non-punitive objective, whether the facility houses pretrial detainees, convicted inmates, or both.").  Courts must afford such deference because "assessing the seriousness of a threat" requires officials to do more than simply take stock of the "specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners *inter se*, and the like." *Hewitt,* 459 U.S. at 474.

Of course, officials' discretion is not unbridled.  They cannot insulate themselves from liability under the Due Process Clause by mechanically citing to broad internal security interests, regardless of how insignificant or unlikely to occur a particular threat might be.  But the record before us suggests that the threat posed to internal security by Steele's conduct was legitimate and ongoing.  MCACC officials had evidence that Steele was conducting an illegal bail bonds scheme with Speedy over the phone.  They also believed that Steele's actions endangered other detainees in the facility because Steele was threatening to disclose detainees' charges

20

to the general MCACC population if those detainees did not use Speedy's service.[12]  So Steele "was placed in administrative segregation . . . to prevent him from posing any additional security risks in the facility," and to allow for continued investigation, without Steele's interference.  App. 1313.

Steele appears to argue further that even if mitigating against security risks was the legitimate, non-punitive purpose behind Defendants' actions, placement in administrative segregation was "excessive" in light of this purpose.  *Stevenson*, 495 F.3d at 67-68.  Steele posits that, instead of transferring him to administrative segregation, MCACC officials "could simply have monitored [him] more closely, or further limited his movements and communication opportunities with other prisoners."  Suppl. Br. of Appellant 3.  But the Due Process Clause does not mandate that MCACC officials use the *least* restrictive means available to accomplish their non-punitive objective.  *See Bell*, 441 U.S. at 542 n.25, 561; *see also Block v. Rutherford*, 468 U.S. 576, 590 n.10, 591 n.11 (1984) (noting that "administrative officials are not obliged to adopt the least restrictive means to meet their legitimate objectives").  Indeed, the Supreme Court was careful to explain in *Bell* that "[g]overnmental action does not have to be the only alternative or even the best

---

[12] According to the complaint submitted about Steele's conduct, Steele had specifically threatened to disclose one detainee's child sex offense charges.  As Sergeant De Amicis pointed out in his affidavit, "[c]hild sex offenders are among the most hated members of the inmate population," so concerns for that detainee's safety were "justifiabl[e]."  App. 1311.

21

alternative for it to be reasonable, to say nothing of constitutional." *Bell*, 441 U.S. at 542 n.25; *see also Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017) (stating that the Supreme Court made clear in *Hewitt* that administrative segregation "is appropriate when necessary to incapacitate an inmate who 'represents a security threat' or to 'complet[e] . . . an investigation into misconduct charges'" (quoting *Hewitt*, 459 U.S. at 476)).

Steele's transfer to administrative segregation was not an excessive response by MCACC officials to legitimate internal security concerns. As discussed, MCACC officials believed that Steele's alleged bail bonds scheme posed a risk to other detainees because they had received information that Steele threatened to disclose a detainee's sex offense charges to the general population as part of the scheme. In light of these security concerns, it was a non-excessive response for MCACC officials to temporarily remove Steele from the general population, where he would be in a position to make such threats to other detainees, while they investigated his conduct.[13]

In sum, Steele has not met his "heavy burden of showing that [Defendants] have exaggerated their response to the genuine security considerations that actuated" his move to more restrictive conditions. *Bell*, 441 U.S. at 561-62. Therefore, we conclude that Steele's transfer to

---

[13] To the extent Steele argues separately that the restriction of his phone privileges constituted prohibited "punishment" under *Bell*, we disagree, given that Steele admitted to contact with Speedy over the phone.

administrative segregation did not violate his substantive due process rights under *Bell*.[14]

## B. Procedural Due Process

In addition to his substantive due process claims, Steele asserts that Defendants denied his procedural due process rights when they transferred him to administrative segregation. To maintain a procedural due process claim, Steele must show that: (1) Defendants deprived him of an individual liberty interest that is encompassed within the Fourteenth Amendment's protection, and (2) the procedures Defendants made available to him did not provide due process of law. *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006). The liberty rights protected by procedural due process are broader than those protected by substantive due process; they "may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,'" or they "may arise from an expectation or interest created by state laws or policies." *Wilkinson v.*

---

[14] Steele also argues that the District Court failed to consider his *pro se* "letter brief" as an affidavit in opposition to Defendants' summary judgment motion. Having considered the letter brief for purposes of this appeal, we conclude that, without more, Steele's conclusory statement that "defendants used the Administrative Segregation as a punishment because [Steele] did not want to agree with the defendants to lie on Speedy bail bonds" is not sufficient evidence to create a genuine issue of material fact as to the purpose for Steele's transfer and to overcome summary judgment as to Steele's substantive due process claims. Suppl. Br. of Appellant 5.

*Austin*, 545 U.S. 209, 221 (2005); *see also Layton v. Beyer*, 953 F.2d 839, 845 (3d Cir. 1992). Interests in the latter category are often referred to as "state-created" liberty interests.

Assuming without deciding that Steele's claimed liberty interests are protected, we agree with the District Court that Steele has not shown a genuine issue of material fact as to whether Defendants provided due process of law. The Supreme Court has explained that when an individual is transferred to administrative segregation because he is "feared to be a threat to institutional security," detention officials must provide only

> an informal, nonadversary evidentiary review . . . for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him. An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. . . . So long as this occurs, and the decisionmaker reviews the charges and then-available

24

> evidence against the prisoner, the
> Due Process Clause is satisfied.

*Hewitt*, 459 U.S. at 474, 476; *see also Stevenson*, 495 F.3d at 70 (citing *Hewitt*). This informal review must take place "within a reasonable time following an inmate's transfer." *Hewitt*, 459 U.S. at 476 n.8.

Steele does not argue that he received insufficient process under *Hewitt*. Indeed, he appears to acknowledge that he received notice of the allegations against him in an interview with prison officials that took place *prior* to his transfer. Steele himself testified that he was informed during the February 25, 2009, meeting that MCACC officials had received a complaint about him "making money for the bail bondsmen" and "threatening inmates" to "try[] to get money out of them." App. 1303. Steele was clear in his deposition that he understood the nature of the allegations against him, explaining that in "[t]he first meeting I'm getting the information. Now I know what's going on. Now I know that they are saying that, okay, we think that you're getting paid for every bail that you bring to them. . . . We think that you're doing this wrong. We think you're doing this illegal." App. 1305. Steele admitted during the February 25th meeting that he had arranged bail bonds with Speedy for other inmates, but claimed he was arranging the bonds "out of the goodness of [his] heart." App. 1305. There is no evidence in the record to suggest that Steele sought and was denied the opportunity to present any additional facts or evidence in support of his position. And while MCACC officials may not have believed Steele's explanation for his conduct, there is no evidence in the record to suggest that they failed to consider his explanation.

25

The focus of Steele's procedural due process challenge circles back to Defendants' asserted reasons for transferring Steele to administrative segregation. He argues that he was transferred for disciplinary reasons, and, therefore, due process protections required MCACC officials to provide him with a written statement of the evidence and charges against him, which he did not receive. *See Stevenson*, 495 F.3d at 70-71. For the reasons already noted, however, we agree with the District Court that the summary judgment record in this case shows that Steele's transfer was for institutional security reasons rather than for discipline or punishment. Steele was administratively separated from the general MCACC population pending further investigation into his conduct and Speedy's activities within the MCACC. Therefore, he was due the level of process outlined in *Hewitt*.[15]

---

[15] Steele also argues, in a single paragraph, that the absence of a specific notice informing him that his telephone privileges would be restricted in administrative segregation violates the Due Process Clause. We cannot agree that MCACC officials were required to explain in their interview with Steele all of the attendant restrictions of his administrative segregation. The key inquiry was whether he received notice of the charges against him and had an opportunity to respond. *Hewitt*, 459 U.S. at 476; *see also Artway v. Att'y Gen. of State of N.J.*, 81 F.3d 1235, 1252 (3d Cir. 1996) ("Due Process requires 'notice reasonably calculated . . . to apprise interested parties of pendency of the action and afford them an opportunity to present their objections.'" (quoting *Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306, 314 (1950))); *Taylor v. Rodriguez*, 238 F.3d 188, 192-93 (2d Cir. 2001) (holding that "the effect of

Steele also contends throughout his briefing that Defendants violated the Due Process Clause by failing to follow the procedures outlined in the Manual. Even if we were to find that the parties' actions implicated certain procedures set forth in the Manual, there is no standalone protected liberty interest in those procedures. *See Rodriguez v. McLoughlin*, 214 F.3d 328, 339 (2d Cir. 2000) (explaining that a state statute "that merely establishes procedural requirements does not thereby create a liberty interest, because an expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause" (internal quotation marks omitted)). The Supreme Court has explained that

> [p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement. . . . The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent

the notice should be to compel the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges." (internal quotation marks omitted)). As discussed, there is no dispute that Steele received such notice here.

27

substantive                          right.

*Olim v. Wakinekona*, 461 U.S. 238, 250-51 (1983).  In other words, a valid due process claim will not automatically follow from Defendants' failure to abide by the Manual's procedural requirements.

Further, where a plaintiff establishes a state-created liberty interest, a court must determine the level of process due by drawing from federal constitutional law, not from state laws, regulations, or policies.  *Layton*, 953 F.2d at 851-52 (holding that while consideration of state regulations "may be relevant in determining" what process is due, "they clearly do not, in and of themselves, define or control the requirements of the Constitution"); *see also Cleveland Bd. of Edu. v. Loudermill*, 470 U.S. 532, 541 (1985) (explaining that "once it is determined that the Due Process Clause applies, . . . [t]he answer to th[e] question [of what process is due] is not to be found in the [state] statute").  So here, the MCACC Manual does not dictate what level of process will pass constitutional muster.  Accordingly, this argument fails.

## V.  CONCLUSION

For the foregoing reasons, the District Court's grant of summary judgment to all Defendants on Steele's substantive and procedural due process claims will be affirmed.